## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHERI MINARSKY, | : | Civil No.  1:23-CV-1000 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | (Magistrate Judge Bloom) |
| KILOLO KIJAKAZI[1], | : | |
| Acting Commissioner | : | |
| of Social Security, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

## I.   Introduction

On December 14, 2020, Sheri Minarsky ("Minarsky") filed an application for disability and disability insurance benefits.  (Tr. 17).  A hearing was held before an Administrative Law Judge ("ALJ"), who found that Minarsky was not disabled from her alleged onset date, January 1, 2020, to the date she was last insured, December 31, 2021. (Tr. 27).

---

[1] Martin O'Malley became the Commissioner of the Social Security Administration on December 20, 2023. Pursuant to Fed. R. Civ. P. 25(d), Mr. O'Malley is substituted as the defendant in this case. Pursuant to 42 U.S.C. § 405(g), no further action is required to continue this suit.

Minarsky now appeals the ALJ's decision, arguing that it is not supported by substantial evidence. (Doc. 10). Specifically, Minarsky contends the ALJ erred by inadequately articulating why he rejected portions of several medical opinions that were favorable to her. (*Id.* at 5-14). After a review of the record, we conclude that the ALJ's decision is not supported by substantial evidence. Therefore, we will remand this matter for further consideration by the Commissioner.

II.   <u>Statement of Facts and of the Case</u>

In October of 2015, Minarsky sought counseling with Amy M. Clark, a licensed clinical social worker ("LCSW"), after her boss allegedly sexually harassed her. (Tr. 400-12). During the initial counseling session, Ms. Clark diagnosed Minarsky with major depressive disorder ("MDD") and generalized anxiety disorder ("GAD"). (Tr. 404). Minarsky discontinued therapy in July of 2016 after she had "gained coping skills and eliminated stressors from her life." (Tr. 400). However, Minarsky's treatment notes indicate that she had filed a lawsuit against her employer and that she might resume therapy as her court date approached. (*Id.*).

2

In December of 2016, Minarsky resumed therapy with Ms. Clark after losing her mother. (Tr. 394-97). Minarsky sporadically attended therapy sessions until April of 2017. (Tr. 382-97). In November of 2018, Minarsky briefly resumed therapy, but stopped seeking treatment in January of 2019 after settling her lawsuit. (Tr. 374-77).

On October 27, 2020, Minarsky returned to therapy with Ms. Clark, presenting with fatigue, noticeable weight gain, an anxious and depressed mood, constricted affect, and paranoia. (Tr. 373). Based on those symptoms, Ms. Clark diagnosed Minarsky with posttraumatic stress disorder ("PTSD"). (*Id.*). Between October of 2020 and January of 2021, Minarsky engaged in therapy with Ms. Clark approximately once per week. (Tr. 357-372). Treatment notes from that period indicate that Minarsky's speech, judgment, insight, behavior, thought processes, perception, and sleeping habits were within normal limits. (*Id.*). However, Minarsky's treatment notes indicate that between November of 2020 and January of 2021, Minarsky experienced suicidal ideation and exhibited a constricted affect. (Tr. 357-371).

On January 20, 2021, Minarsky attended an initial consultation with Jacqueline Gillern, N.P. ("Nurse Gillern"), for medication management. (Tr. 574). At that time, Minarsky was taking Effexor once per day and Buspar as needed to manage her PTSD, MDD, and GAD. (Tr. 574). During the visit, Minarsky reported that she had experienced past sexual trauma and that, on a typical day, she slept in late, watched television, used the computer, and played games on her phone. (*Id.*). Nurse Gillern increased Minarsky's Buspar dosage to twice per day and directed her to continue taking Effexor. (Tr. 362, 580).

Between February and April of 2021, Minarsky met with Nurse Gillern and Ms. Clark multiple times per month. (Tr. 350-61, 606, 920-24). During her visits with Nurse Gillern, Minarsky reported that she was feeling depressed, was "not manag[ing] her [activities of daily living] on a daily basis," was too anxious to go anywhere alone, and watched television or played on her phone during the day to divert her attention from her anxiety. (Tr. 606). During her visits with Ms. Clark, Minarsky discussed various family issues and stress from her prior workplace sexual assault. (Tr. 348-56, 926-33). Ms. Clark's treatment notes state

4

that Minarsky often exhibited paranoid ideation, was depressed and anxious, and displayed a constricted affect. (Tr. 348-56).

In May of 2021, Minarsky continued consulting regularly with Nurse Gillern and Ms. Clark, and she attended a routine checkup with Dr. Brenda T. Goodrich, D.O., her primary care physician. (Tr. 613-21, 566, 922-25). During her checkup, Minarsky displayed normal affect, mood, thought content, behavior, and judgment. (Tr. 566). Nurse Gillern's treatment notes state that Minarsky's concentration, attention, and fund of knowledge were within normal limits but that her mood was sad, her insight was poor, her thoughts were racing, and she felt helpless and hopeless. (Tr. 617, 621). To mitigate these symptoms, Nurse Gillern prescribed Risperdal and, when that proved ineffective, she increased Minarsky's Effexor dosage. (Tr. 613, 617).

In June and July of 2021, Minarsky reported modest psychological improvements to Nurse Gillern and Ms. Clark. (Tr. 628, 918, 921). During an appointment with Ms. Clark, Minarsky reported that her depression "may have decreased a little" after her Effexor dosage was increased and that she was looking forward to a trip to Niagara Falls

with her husband.  (Tr. 921).  Similarly, Minarsky told Nurse Gillern that after her Effexor dosage was increased, her anxiety decreased, her energy increased, and she began showering and leaving the house more often. (Tr. 628).  For example, in July of 2021, Minarsky told Nurse Gillern that she attended a Fourth of July parade.  (Tr. 918).

In August and September of 2021, Minarsky reported additional improvements during appointments with Dr. Goodrich, Nurse Gillern, and Ms. Clark.  (Tr. 639-43, 667, 673, 685, 808, 911-12).  During her sessions with Ms. Clark in August of 2021, Minarsky reported that she planned to gather with family for her father's birthday and that she and her husband had taken their adult son and his friend out to dinner.  (Tr. 911-12).  Minarsky reported to Ms. Clark and Nurse Gillern that Buspar was decreasing her social anxiety and stated to Nurse Gillern that she was slowly making progress.  (Tr. 639, 914).  Nurse Gillern's treatment notes indicate that Minarsky appeared anxious, displayed fair insight and judgment, and exhibited normal attention, concentration, speech, and cognition.  (Tr. 639-43).  Similarly, Dr. Goodrich's treatment notes

indicate that Minarsky's mood and affect were normal and that she was oriented to person, place, and time. (Tr. 667, 673, 685, 808).

In October of 2021, Minarsky sought treatment at a weight management clinic and continued treating with Ms. Clark. (Tr. 662, 908-09). During her appointment at the weight management clinic, Minarsky was cooperative and interactive, displayed good social relatedness, had a "bright" affect, exhibited good eye contact and speech, and displayed no obvious neurological deficits. (Tr. 662). During her visits with Ms. Clark, Minarsky reported that she had been driving her daughter to and from work every day and that she felt overwhelmed handling her father's estate after he passed in September of 2021. (Tr. 908-09).

In January of 2022, shortly after her date last insured, Minarsky reported to Ms. Clark and Nurse Gillern that she had been more socially active. (Tr. 877, 879-81, 903). During her meetings with Ms. Clark, Minarsky reported that she had flown to Georgia the previous month for her niece's baby shower. (Tr. 903). Minarsky reported to Nurse Gillern that she was managing her activities of daily living, including handling her father's estate, and that she felt her current medication regimen was

working for her. (Tr. 877). Nurse Gillern's treatment notes indicate that Minarsky's PTSD, MDD, and GAD were stable and that Minarsky exhibited fair insight and judgment and normal speech, attention, concentration, cognition, and mood. (Tr. 879-81).

In May of 2022, Minarsky continued experiencing anxiety but was generally stable. (Tr. 789, 853-57). Ms. Clark's treatment notes indicate that Minarsky was alert and oriented, exhibited normal mood, had fluent speech, and appeared stable on her current medication regimen. (Tr. 789). Similarly, Nurse Gillern's notes state that Minarsky was anxious but that her memory, speech, attention span, and fund of knowledge were normal. (Tr. 853-57). Minarsky reported to Nurse Gillern that her mood fluctuated from sad to neutral, that she was still having trouble sleeping, and that she was stressed from handling her father's estate. (Tr. 853). However, she also reported that her medication regimen was still working well. (*Id.*).

On June 8, 2022, Minarsky was evaluated by Marielle Stone, MD, a consultative examiner. (Tr. 950). During the evaluation, Minarsky reported that she cooked two to three times per week, cleaned one or two

times per week, did laundry twice per week, and could operate a vehicle. (Tr. 951-52).  Dr. Stone opined that Minarsky had very few physical or environmental limitations but could never tolerate exposure to pulmonary irritants.  (Tr. 957-59).

On July 28, 2022, Minarsky was examined by Dr. Jennifer Betts, Psy.D., a consultative examiner.  (Tr. 977).  Minarsky reported that, depending on her energy levels, she could shop online, drive a vehicle, cook, clean, and do laundry.  (Tr. 981).  Dr. Betts's notes state that Minarsky was cooperative and friendly and that her manner of relating, social skills, and overall presentation were "adequate."  (Tr. 979).  On examination, Dr. Betts found that Minarsky's attention and concentration were mildly impaired but that her memory was intact, her thought processes were coherent and goal-directed, her cognitive functioning was projected to be in the average range, her general fund of information was appropriate for her age, and her insight and judgment were fair to good.  (Tr. 980).

Based on these examination results, Dr. Betts completed a medical source statement, in which she evaluated Minarsky's ability to work.  (Tr.

982).  Dr. Betts opined that Minarsky could understand, remember, and carry out simple instructions and make judgments on simple work-related decisions.  (*Id.*).  However, Dr. Betts found that Minarsky was mildly impaired in her ability to understand, remember, and carry out complex instructions and her ability to make judgments on complex work-related decisions.  (Tr. 982).  She also opined that Minarsky was moderately impaired in her ability to interact appropriately with the public and with coworkers.  (*Id.*).  Finally, Dr. Betts found that Minarsky was markedly impaired in her ability to interact appropriately with supervisors and respond appropriately to usual work situations and changes in a routine work setting.  (Tr. 983).  Dr. Betts explained that she assessed those marked impairments because Minarsky's "PTSD is specifically related to work/boss context."  (*Id.*).

Against the backdrop of this evidence, the ALJ conducted a hearing regarding Minarsky's disability application on June 10, 2022, during which Minarsky and a vocational expert both testified.   (Tr. 35-66).  Minarsky testified that she lives with her husband and two children, has an associate degree in architecture, and previously worked as an order

10

picker at a warehouse, a clerk for the Veterans' Affairs Office in Susquehanna County, and a tax collector for Forest Lake Township. (Tr. 44-45, 47). Minarsky testified that her supervisor sexually assaulted her between 2009 and 2013, causing her to suffer anxiety about returning to work. (Tr. 49, 55). According to Minarsky, she did not return to work after her term as tax collector ended because she became anxious when members of the public came to her home to pay their taxes. (Tr. 48).

Minarsky testified that due to her anxiety, she spends most of her time at home watching television, playing on her phone, reading, and cooking, depending on how tired she is. (Tr. 51). Though Minarsky testified that she can shop online, she maintains that she suffers panic attacks if she shops alone in a store. (Tr. 51-52). Therefore, according to Minarsky, her husband either goes grocery shopping for her or accompanies her to the store. (Tr. 52). However, when questioned by the ALJ, Minarsky acknowledged that she had travelled to Georgia with her daughter in October of 2021. (Tr. 57).

In addition to anxiety, Minarsky also testified that she suffers from paranoia and irritable bowel syndrome ("IBS"). (Tr. 54). According to

Minarsky, her paranoia prevents her from retrieving her mail from the top of her driveway by herself.  (Tr. 52).  She also testified that her IBS causes her to experience severe cramps and an urgent need to use the bathroom within half an hour of eating.  (Tr. 54).  Therefore, according to Minarsky, she has difficulty concentrating at work and can never work far from a bathroom.  (*Id.*).

After Minarsky testified, the ALJ heard testimony from Marian Marracco, a vocational expert.  (Tr. 58).  The ALJ asked Ms. Marracco several hypothetical questions pertaining to Minarsky's residual functional capacity ("RFC")—that is, her "ability to do physical and mental work activities on a sustained basis despite limitations from her impairments."  (Tr. 19, 59-62).  Upon questioning by Minarsky's attorney, Ms. Marracco testified that someone who frequently—that is, two thirds of the time—was unable to respond appropriately to changes in a routine work setting would likely be unable to maintain employment.  (Tr. 63).

Following the hearing, on August 25, 2022, the ALJ issued a decision denying Minarsky's application for benefits.  (Tr. 14-28).  At Step 1 of the sequential analysis that governs Social Security cases, the ALJ

12

concluded that Minarsky did not engage in substantial gainful activity between January 1, 2020, her alleged onset date, and December 31, 2021, the date Minarsky was last insured. (Tr. 19). At Step 2, the ALJ found that Minarsky suffered from the following severe impairments: PTSD, anxiety disorder, depressive disorder, IBS, obesity, asthma, and diabetes. (*Id.*). At Step 3, the ALJ concluded that none of Minarsky's severe impairments met or equaled the severity of a listed impairment under the Commissioner's regulations. (Tr. 20-21).

Between Steps 3 and 4, the ALJ concluded that Minarsky had the RFC to:

> [P]erform less than the full range of light work as defined in 20 CFR 404.1567(b). Specifically, the claimant could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, sit for up to six hours, and stand or walk for approximately six hours in an eight-hour day with normal breaks. She could occasionally climb ramps or stairs; occasionally climb ladders, ropes or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. She needed to avoid concentrated exposure to extremes of cold or humidity, and needed to avoid concentrated exposure to smoke, dust, and respiratory irritants. She could perform work limited to simple, routine, and repetitive tasks in a work environment free of fast paced production requirements as would be experienced on an assembly line; involving only simple, work-related decisions; with few, if any, workplace changes. The claimant could interact with supervisors on an occasional

basis throughout the workday after learning her job duties from an instructional or demonstration lesson. She could interact occasionally with coworkers and the public.

(Tr. 21).

In reaching this RFC determination, the ALJ considered the objective medical record detailed above, Minarsky's reported symptoms, and the opinion evidence. (Tr. 21-26). Ultimately, the ALJ found that Minarsky's statements concerning the intensity, persistence, and limiting effects of her impairments were not entirely consistent with the objective medical evidence. (Tr. 24). In making this determination, the ALJ reasoned that Minarsky's attention span, concentration, insight, judgment, thought content and processes, speech, affect, and mood were often within normal limits. (Tr. 23). He also noted that Minarsky was able to engage in substantial activities of daily living, such as travelling to Georgia in October and December of 2021, serving as the executor of her father's estate, cooking, cleaning, doing laundry, operating a motor vehicle, playing games on her phone, and online shopping. (Tr. 24).

After evaluating the objective medical evidence, the ALJ considered the medical opinions in the record. (Tr. 24-26). First, the ALJ considered

14

the opinions of two state agency consultants—Dr. Sanjay M. Gandhi, M.D., and Dr. Louis Joseph Tedesco, M.D. (Tr. 24). Both consultants opined that Minarsky could stand, walk, or sit for six hours in a typical 8-hour workday. (*Id.*). Dr. Gandhi opined that Minarsky could never climb ladders, ropes, or scaffolds, could occasionally crawl, and could frequently climb ramps and stairs, balance, stoop, kneel, and crouch. (*Id.*). Both doctors opined that Minarsky had no postural, manipulative, visual, or communicative limitations. (*Id.*). While Dr. Tedesco opined that Mianrsky also had no environmental limitations, Dr. Gandhi opined that Minarsky should avoid concentrated exposure to extreme cold, humidity, hazards, fumes, odors, dusts, and gasses. (*Id.*).

The ALJ found both opinions somewhat persuasive. (Tr. 24). He found that both doctors explained their findings but noted that neither doctor examined Minarsky and that both doctors reviewed an incomplete medical record. (*Id.*). Ultimately, the ALJ found that the record supported limiting Minarsky to light exertional work. (*Id.*).

The ALJ then considered Dr. Stone's opinion, which he found generally persuasive. (Tr. 25). The ALJ reasoned that Dr. Stone's clinical

findings were largely consistent with other evidence, such as Minarsky's examination results and her reported activities of daily living. (*Id.*). However, he found that Minarsky did not need to avoid all exposure to pulmonary irritants because her respiratory clinical findings were typically negative and there was limited evidence regarding her asthma. (*Id.*).

The ALJ then considered several opinions regarding Minarsky's mental capabilities, the first of which was rendered by Dr. Karen Louise Plowman, Psy.D., a state consultant. (Tr. 25). Dr. Plowman opined that Minarsky could perform simple "one to two step tasks on a sustained basis despite the limitations associated with her impairments." (Tr. 80). The ALJ found this opinion somewhat persuasive, reasoning that it was consistent with other evidence, such as Minarsky's daily activities. (Tr. 25). However, the ALJ found that the record supported additional limitations, which he did not specify in his opinion. (*Id.*).

The ALJ next considered the opinion of Anthony Galdieri, Ph.D., a state consultant. (Tr. 25). Dr. Galdieri opined that Minarsky could "make simple decisions and follow short simple directions using good

judgment[,]" "adapt to basic job-related changes [without] special supervision[,]" and "understand, remember and carry out basic one-three step command instructions on a consistent basis." (Tr. 90). The ALJ found Dr. Galdieri's opinion persuasive on the grounds that it was supported by an explanation and was consistent with medical evidence and Minarsky's activities. (Tr. 25).

The ALJ then turned to the opinion of Amy Clark, Minarsky's therapist. (Tr. 25). Ms. Clark opined that Minarsky was either markedly or extremely limited in all mental abilities needed to perform unskilled work. (Tr. 849). For example, Ms. Clark found that Minarsky was markedly limited in her ability to understand, remember, and carry out very short and simple instructions and was extremely limited in her ability to maintain regular attendance, complete a normal workday, and deal with normal work stress. (*Id.*). Ms. Clark opined that because of those limitations, Minarsky would have to be absent from work more than three times per month. (Tr. 850).

The ALJ found Ms. Clark's opinion less persuasive. (Tr. 25). The ALJ reasoned that Ms. Clark's opinion was inconsistent with Minarsky's

17

treatment notes, which showed that she was cooperative and interactive, exhibited normal attention and concentration, and displayed normal behavior, and with the notes from Dr. Betts's consultative examination, which state that Minarsky was cooperative and friendly, displayed adequate social skills, and only had mildly impaired attention and concentration. (*Id.*). He also reasoned that Ms. Clark's opinion was inconsistent with Minarsky's activities of daily living, which included her ability to travel out of town. (*Id.*).

The ALJ next considered Nurse Gillern's opinion. (Tr. 25). Nurse Gillern opined that Minarsky was moderately limited in her ability to remember work-like procedures and understand, remember, and carry out very simple instructions and either markedly or extremely limited in all other areas of work-related functioning, such as her ability to maintain attention, regular attendance, and punctuality, sustain an ordinary routine without special supervision, and perform at a consistent pace. (Tr. 936). She also opined that Minarsky was extremely limited in her ability to get along with coworkers or peers and respond appropriately to changes in a routine work setting. (*Id.*). The ALJ

reasoned that Nurse Gillern's opinion "was less persuasive, as it was not supported by her treatment notes, which documented limited positive clinical findings, and was inconsistent with the claimant's activities, such as using the computer, playing games, preparing food, driving, and traveling out of town." (Tr. 25).

Finally, the ALJ considered Dr. Betts's opinion, which he found somewhat persuasive. (Tr. 25-26). The ALJ reasoned that "[t]he marked limitations [in Dr. Betts's opinion] were not supported by Dr. Betts' clinical findings, which were completely normal except for mild impairment in attention and concentration." (Tr. 26). The ALJ also reasoned that "the marked limitations regarding responding to usual work situations and changes in a routine work setting were inconsistent with the claimant's ability to drive and travel out of town." (*Id.*).

Having made these findings, the ALJ found at Step 4 that Minarsky could not perform her past work, but found at Step 5 that she could perform other jobs in the national economy, such as garment sorter, dispatcher-router, and mail clerk/sorter. (Tr. 26-27). Accordingly, the

ALJ found that Minarsky had not met the stringent standard prescribed for disability benefits and denied her claim. (Tr. 27).

This appeal followed. On appeal, Minarsky challenges the ALJ's decision on the grounds that he failed to meet his burden of articulation when evaluating the opinions of Dr. Betts, Nurse Gillern, and Ms. Clark and failed to include all Minarsky's credibly established limitations in the hypothetical questions posed to the vocational expert. (Doc. 10 at 5-16). As discussed in greater detail below, having considered the arguments of counsel and carefully reviewed the record, we conclude that the ALJ's decision should be remanded for further consideration.

III. <u>Discussion</u>

A. <u>Substantial Evidence Review – the Role of This Court</u>

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decisionmaker are supported by substantial evidence in the record. *See* 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence means less than a preponderance of the evidence

but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted). However, where there has been an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). The court must "scrutinize the record as a whole" to determine if the decision is supported by substantial evidence. *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Under this standard, we must look to the existing administrative record to determine if there is "'sufficient evidence' to support the agency's factual determinations." *Id.* Thus, the question before us is not whether the claimant is disabled, but rather, whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was based upon a correct application of the law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal

22

matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . ").

When conducting this review, "we must not substitute our own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we cannot reweigh the evidence. Instead, we must determine whether there is substantial evidence to support the ALJ's findings. In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000). This does not require the ALJ to use "magic" words, but rather, the ALJ must discuss the evidence and explain the reasoning behind his or her decision with more than just conclusory statements. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted). Ultimately, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

23

**B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a). This requires a claimant to show a severe physical or mental impairment that precludes her from engaging in previous work or "any other substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination, the ALJ follows a five-step evaluation. 20 C.F.R. §§404.1520(a), 416.920(a). The ALJ must

24

sequentially determine whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able to do any other work, considering his or her age, education, work experience and RFC.  20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also determine the claimant's RFC.  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1).  In making this assessment, the ALJ must consider all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at Step 2 of his or her analysis.  20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).  Our review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by substantial evidence.  *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

The claimant bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents her from engaging in any past relevant work. *Mason*, 994 F.2d at 1064. If met, the burden then shifts to the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination. While some courts emphasize the necessity of medical opinion evidence to craft a claimant's RFC, *see Biller v. Acting Comm'r of Soc. Sec.,* 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013), other courts have taken the approach that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006) (nonprecedential). Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an ALJ must always base his RFC on a medical opinion

26

from a physician is misguided." *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision.   Cases that emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence. *Biller*, 962 F. Supp. 2d at 778–79.   These cases simply restate the notion that medical opinions are entitled to careful consideration when making a disability determination.   On the other hand, when no medical opinion supports a disability finding or when an ALJ relies upon other evidence to fashion an RFC, courts have routinely sustained the ALJ's exercise of independent judgment based upon all the facts and evidence.   *See Titterington,* 174 F. App'x 11-12; *Cummings,* 129 F. Supp. 3d at 214–15. Ultimately, it is our task to determine, considering the entire record, whether the RFC determination is supported by substantial evidence. *Burns,* 312 F.3d 113.

## C. Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The plaintiff filed this disability application on December 14, 2020, after Social Security Regulations regarding the consideration of medical opinion evidence were amended. Before March of 2017, the regulations established a hierarchy of medical opinions, deeming treating sources to be the gold standard. However, in March of 2017, the regulations governing the treatment of medical opinions were amended. Under the amended regulations, ALJs are to consider several factors to determine the persuasiveness of a medical opinion: supportability, consistency, relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c).

Supportability and consistency are the two most important factors, and an ALJ must explain how these factors were considered in his or her written decision. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *Blackman v. Kijakazi*, 615 F. Supp. 3d 308, 316 (E.D. Pa. 2022). Supportability means "[t]he more relevant the objective medical evidence and supporting explanations . . . are to support his or her medical opinion(s) . . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. §§

28

404.1520c(c)(1), 416.920c(c)(1).   The consistency factor focuses on how consistent the opinion is "with the evidence from other medical sources and nonmedical sources."  20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

While there is an undeniable medical aspect to the evaluation of medical opinions, it is well settled that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations."  *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).  When confronted with several medical opinions, the ALJ can choose to credit certain opinions over others but "cannot reject evidence for no reason or for the wrong reason."  *Mason*, 994 F.2d at 1066.  Further, the ALJ can credit parts of an opinion without giving credit to the whole opinion and may formulate a claimant's RFC based on different parts of different medical opinions, so long as the rationale behind the decision is adequately articulated.  *See Durden v. Colvin*, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016).

### D. This Case Should be Remanded to the Commissioner.

As we have noted, the ALJ must articulate his reasoning regarding the supportability and consistency factors for each medical opinion.  20

29

C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  For the reasons set forth below, we find that the ALJ has not met his burden of articulation with respect to Ms. Clark's, Nurse Gillern's, and Dr. Betts's opinions.  Because we cannot say at this juncture that the ALJ's errors were harmless, remand is required. *Timothy J. B. v. O'Malley*, No. 4:22-CV-1036, 2024 WL 968875, at *4 (M.D. Pa. Mar. 6, 2024) (explaining that remand is not required unless there is "reason to believe that the remand might lead to a different result.") (quoting *Moua v. Colvin*, 541 F. App'x 794, 798 (10th Cir. 2013)) (citation and internal quotation marks omitted).

### i.    The ALJ Erred When Considering Ms. Clark's Opinion.

Minarsky first argues that the ALJ failed to articulate his reasoning regarding supportability and consistency when considering Ms. Clark's opinion.  (Doc. 10 at 5-11).  We agree in part.  Though the ALJ adequately explained his reasoning regarding consistency, he failed to analyze supportability.

When addressing the consistency factor, the ALJ explained that Ms. Clark's opinion was inconsistent with Minarsky's treatment notes, which showed that she was cooperative and interactive, exhibited normal

30

attention and concentration, and displayed normal behavior, and inconsistent with the notes from Dr. Betts's consultative examination, which state that Minarsky was cooperative and friendly, displayed adequate social skills, and only had mildly impaired attention and concentration. (Tr. 25). The ALJ also reasoned that Ms. Clark's opinion was inconsistent with Minarsky's activities of daily living, which included her ability to travel out of town. (*Id.*). Because the ALJ included citations to the record, which provided more than a scintilla of evidence for his reasoning, we find that the ALJ's consistency analysis is supported by substantial evidence. *Solberg v. O'Malley*, No. 23-CV-2639, 2024 WL 1943328, at *6 (E.D. Pa. Apr. 30, 2024) (finding that the ALJ provided more than a scintilla of evidence where he included citations to the record showing that the registered nurse's opinion was inconsistent with her own treatment notes and the plaintiff's activities of daily living).

However, as Minarsky argues, the ALJ failed to address the supportability factor. (Doc. 10 at 9). The ALJ did not consider the supporting explanations in Ms. Clark's opinion. 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1); *Hammond v. O'Malley*, No. 23-CV-2039,

2024 WL 2747966, at *11 (E.D. Pa. May 29, 2024) (holding that the ALJ erred by failing to consider the supporting explanations in a medical opinion). Nor did he evaluate whether the opinion contained "relevant [] objective medical evidence...." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). The Commissioner notes that the ALJ considered Ms. Clark's treatment notes. (Doc. 12 at 19). However, those notes bear on consistency, not supportability, because they are not referenced in Ms. Clark's opinion. *See Solberg v. O'Malley*, No. 23-CV-2639, 2024 WL 1943328, at *6 (E.D. Pa. Apr. 30, 2024) (holding that the ALJ failed to address supportability even though he considered the expert's treatment notes). Because the ALJ failed to analyze the supportability of Ms. Clark's opinion, he committed error. *Larkin v. O'Malley*, No. 23-CV-275, 2024 WL 1675678, at *4 (D. Del. Mar. 28, 2024) (explaining that "[f]ailure to evaluate supportability is error.").

ii.   **The ALJ Erred When Considering Nurse Gillern's Opinion.**

Minarsky also argues that the ALJ erred when considering Nurse Gillern's opinion. (Doc. 10 at 5-11). Again, we agree. The ALJ evaluated Nurse Gillern's opinion in one sentence, reasoning that it "was less

persuasive, as it was not supported by her treatment notes, which documented limited positive clinical findings, and was inconsistent with the claimant's activities, such as using the computer, playing games, preparing food, driving, and traveling out of town." (Tr. 25). This single sentence does not fulfil the ALJ's obligation to explain how he evaluated the consistency and supportability factors. *Andrews v. Kijakazi*, No. 1:20-CV-01878, 2022 WL 617118, at *8 (M.D. Pa. Mar. 2, 2022) (remanding where "the ALJ tersely addressed both the supportability and consistency of Dr. Todd's opinion…in one sentence…").

As Minarsky argues, the ALJ failed to analyze the supportability factor when considering Nurse Gillern's opinion. (Doc. 10 at 10-11). The ALJ did not consider the supporting explanations in the opinion or consider whether the opinion was supported by relevant medical evidence, as the regulations require. 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1); *Hammond*, 2024 WL 2747966, at *11 (holding that the ALJ erred by failing to consider the supporting explanations in a medical opinion). To the extent the Commissioner argues that the ALJ considered supportability by analyzing Nurse Gillern's treatment notes,

he is incorrect.  (Doc. 12 at 19).  Because those treatment notes are not referenced in Nurse Gillern's opinion, they have no bearing on whether the opinion was supported by "objective medical evidence and supporting explanations."  20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1);  *See Solberg*, 2024 WL 1943328, at *6 (holding that the ALJ failed to address the sufficiency factor whatsoever even though he found that the expert's treatment notes contradicted her opinion).  Accordingly, the ALJ failed to evaluate the supportability factor when considering Nurse Gillern's opinion.  For that reason alone, he committed error.  *Larkin*, 2024 WL 1675678, at *4.

Additionally, the ALJ failed to articulate his reasoning regarding the consistency factor.  The ALJ's statement that Nurse Gillern's opinion "was not supported by her treatment notes, which documented limited positive clinical findings…" is too conclusory for this court to find that the ALJ's decision is supported by substantial evidence.  (Tr. 25); *See Alejandro v. O'Malley*, No. 21-CV-04076, 2024 WL 1704904, at *4 (E.D. Pa. Apr. 18, 2024) (finding that the ALJ offered "a conclusion, not an explanation" when he stated that a doctor's opinion was "'inconsistent

with his own treatment notes…, which generally reflect mild mental status examinations…'"). Moreover, because the ALJ failed to cite the relevant treatment notes, we cannot meaningfully review his reasoning. *Brownsberger v. Kijakazi*, No. 3:20-CV-01426, 2022 WL 178819, at *7 (M.D. Pa. Jan. 18, 2022) (remanding where, among other things, the "ALJ d[id] not provide any citations to specific evidence on the record to explain his reasoning…."). Because the ALJ did not adequately consider whether Nurse Gillern's opinion was consistent with other medical sources, his consistency analysis is not supported by substantial evidence. *See* 20 C.F.R. § 416.920c(c)(2) (explaining that an ALJ must consider whether each opinion is consistent "with the evidence from other medical sources *and* nonmedical sources.") (emphasis added).

### iii.   The ALJ Erred When Considering Dr. Betts's Opinion.

Finally, Minarsky argues that the ALJ erred when considering Dr. Betts's opinion. (Doc. 10 at 11-15). We agree. When assessing supportability, the ALJ reasoned that "the marked limitations were not supported by Dr. Betts' clinical findings, which were completely normal except for mild impairment in attention and concentration." (Tr. 26).

However, the ALJ failed to address the supporting explanations provided by Dr. Betts.  Though those explanations were terse, the ALJ's failure to address them whatsoever was erroneous.  *Hammond*, 2024 WL 2747966, at *11 (remanding where, among other things, the ALJ failed to address a doctor's limited explanation that the "Plaintiff's past decompensation occurred when working in a stressful, semi-skilled environment…").

The ALJ also failed to provide substantial evidence for his consistency analysis.  When addressing consistency, the ALJ reasoned that "the marked limitations regarding responding to usual work situations and changes in a routine work setting were inconsistent with the claimant's ability to drive and travel out of town." (Tr. 26).  However, the ALJ erred by failing to consider evidence from "other medical sources," as the regulations require.  20 C.F.R. § 416.920c(c)(2) (explaining that an ALJ must consider whether each opinion is consistent "with the evidence from other medical sources and nonmedical sources"); *see Hill v. Kijakazi*, No. 22-CV-145, 2023 WL 6626125, at *9 (E.D. Pa. Oct. 11, 2023) (finding that the ALJ erred when considering consistency

because he only considered evidence from one other medical source and did not consider any nonmedical sources).

### iv. <u>We Cannot Say That The ALJ's Errors Were Harmless.</u>

Having determined that the ALJ erred when considering Ms. Clark's, Nurse Gillern's, and Dr. Betts's opinions, we must now consider whether those errors were harmless. Social Security appeals are subject to harmless error analysis. *See Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016). Under the harmless error analysis, remand is warranted only if there is "reason to believe that the remand might lead to a different result." *Timothy J. B.*, 2024 WL 968875, at *4 (quoting *Moua*, 541 F. App'x at 798) (citation and internal quotation marks omitted). The plaintiff has the burden of showing that the ALJ's error was harmful. *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

Here, remand might lead to a different result if the ALJ finds the opinions of Dr. Betts, Nurse Gillern, or Ms. Clark persuasive after full consideration.[2] As Minarsky points out, the vocational expert testified

---

[2] We take no position on whether the ALJ should have found those opinions persuasive or, more broadly, whether the ALJ should have granted Minarsky's application.

37

that someone who is frequently unable to respond appropriately to changes in a routine work setting would likely be unable to perform any jobs in the national economy. (Doc. 10 at 7-8 (citing Tr. 61-66)). Because Dr. Betts, Nurse Gillern, and Ms. Clark all opined that Minarsky was either extremely or markedly impaired in her ability to respond appropriately to changes in a routine work setting, the ALJ would likely find that Minarsky is unable to work if he fully adopts any of their opinions on remand. (Tr. 849, 936, 983). Additionally, Ms. Clark and Nurse Gillern opined that Minarsky would be absent from work more than three times per month, which, according to the vocational expert, would preclude her from performing unskilled jobs, like those identified by the ALJ. (Tr. 59, 62, 850, 937). Therefore, we cannot say that the ALJ's errors were harmless, and we must remand the case for further consideration.[3]

---

[3] Minarsky also argues that the ALJ erred by failing to include all her credibly established limitations in his hypothetical question to the vocational expert. (Doc. 10 at 15-16). We will not separately address this argument for two reasons. First, it is premised on Minarsky's contention that the ALJ erred in considering the opinions of Dr. Betts, Nurse Gillern, and Ms. Clark, which we have addressed above. (*Id.*). Second, determining a claimant's limitations is beyond the scope of our review.

## IV.   <u>Conclusion</u>

For the foregoing reasons, the decision of the Commissioner will be REVERSED and this case will be REMANDED for a new hearing pursuant to 42 U.S.C. § 405(g).

An appropriate order follows.

Submitted this 29th day of August 2024.

<u>*s/ Daryl F. Bloom*</u>
Daryl F. Bloom
Chief United States Magistrate Judge

---

*See Johnson*, 529 F.3d at 200 (explaining that the court's review is limited to whether the ALJ's decision is supported by substantial evidence).